STATE, Respondent, v. NOWAKOWSKI, Appellant.

*No. State 184. Argued January 7, 1975.—Decided April 10, 1975.*
(Also reported in 227 N. W. 2d 697.)

For the appellant there were briefs by *Warshafsky, Rotter & Tarnoff, S. C.,* attorneys, and *Ted M. Warshafsky* and *Randall E. Reinhardt* of counsel, all of Milwaukee, and oral argument by *Ted M. Warshafsky*.

For the respondent there was a brief and oral argument by *Paul J. Gossens,* assistant attorney general and special prosecutor, Milwaukee county.

There was a brief amicus curiae filed for the Wisconsin Civil Liberties Union by *Michael S. Jacobs* of counsel, Milwaukee.

DAY, J.   On October 1, 1974, Richard C. Nowakowski (defendant) was convicted of one count of failure to report a campaign contribution of $800 worth of postage stamps, while a candidate for re-election to the Milwaukee county board of supervisors, in a report filed April 20, 1972, in violation of sec. 12.09 (1) and (3) (a), Stats. 1971.[1]   He was sentenced to pay a fine of $1,000

[1] Sec. 12.09 (1), Stats. 1971, in pertinent part, is as follows:
"12.09 **Receipts and disbursements by candidates and committees.**
(1) Every candidate and the secretary of every personal campaign committee shall on the Tuesday preceding any primary or election

or one year in the county jail and pursuant to sec. 12.70 [2] mandatory ouster from office as a supervisor of the Milwaukee county board, which position he held at the time of his conviction. A supplemental judgment of ouster from office was entered pursuant to secs. 12.28 (1) [3] and 17.03 (5).[4]

and on the Tuesday following any primary or election, file a financial statement verified upon the oath of such candidate or upon the oath of the secretary of such committee, which statement shall cover all transactions not accounted for and reported upon in statements theretofore filed. . . ."

Sec. 12.09 (3) (a), in pertinent part, is as follows:

"(3) . . . such statement . . . shall give in full detail:

"(a) Every contribution whether it is a sum of money and all property, or other thing of value, over $5 in amount or value, received by such candidate or committee during such period from any source whatsoever which he, or such committee on his behalf, uses or has used, or is at liberty to use for political purposes, . . ."

[2] "12.70 **Penalty for violations.** Any person violating this chapter shall be imprisoned in the county jail not less than one month nor more than one year, or in the state prison not less than one year nor more than 3 years, or fined not less than $25 nor more than $1,000, or both; and no person so convicted shall be permitted to take or hold the office to which he was elected, if any, or receive the emoluments thereof."

[3] "12.28 **Supplemental judgment of forfeiture of office on conviction.** (1) If the successful candidate for any office under the constitution of laws of this state, or under any ordinance of any town or municipality therein, other than the office of state senator or member of assembly, shall, in a criminal action, be adjudged guilty of any violation of this chapter committed during his candidacy or election, the court shall, after entering such judgment, enter a supplemental judgment declaring a forfeiture of the defendant's right to the office and transmit to the filing officer of such candidate a transcript of such supplemental judgment. Such candidate shall not thereafter succeed to the office if his term shall not yet have begun, and the office shall become vacant if his term shall have begun and it shall be filled in the manner provided by law."

[4] "17.03 **Vacancies, how caused.** . . .

"(5) His conviction by a state or United States court of and sentence for treason, felony or other crime of whatsoever nature

The charge on which the defendant was convicted was one count of a two-count indictment issued by a grand jury against the defendant on March 28, 1973.

The second count of failing to report a $60 campaign contribution was dismissed on motion of the state prior to trial.

The offense with which the defendant was charged and convicted is a felony. He was charged with failing to report a political contribution from one Angelo Ditello, president of National Transit Cartage Company, of $800's worth of postage stamps. The jury found the defendant had wilfully failed to include the donation in his campaign report as required by statute.

At the trial, Mr. Ditello testified that he was the president of a corporation known as National Transit Cartage Company and that in 1971 and part of 1972 his company was located at 2619 South Fifth Street in Milwaukee. He testified the company had made efforts to lease and buy property from Milwaukee county and that in January, 1972, they leased two and a half acres from the county south of the terminal on Fifth Street. He testified that in late 1971 and 1972 in their operation they had 19 tractors, 2 straight trucks, and 25 trailers, which varied in length from 23 to 40 feet; that the trailers were parked south of the terminal and the tractors were parked across the street. He had wanted

punishable by imprisonment in any jail or prison for one year or more, or his conviction by any such court of and sentence for any offense involving a violation of his official oath, in either case whether or not sentenced to imprisonment. A vacancy so created shall in no case be affected by a stay of execution of judgment. Reversal of the judgment against such officer shall forthwith restore him to office, if the term for which he was elected or appointed has not expired, but, in any event, shall entitle him to the emoluments of the office for all the time he would have served therein had he not been so convicted and sentenced; but pardon shall not restore him to office or entitle him to any of the emoluments thereof."

to acquire the property across the street and said he talked to Supervisor Nowakowski at a county board meeting early in 1971. He said he offered to either purchase the property or lease it, but that the defendant was against it at that time. He had also tried to lease or buy this property in 1965 or 1966. On November 5, 1971, Mr. Ditello met with the defendant at Baker's restaurant; the meeting had been arranged by Mr. Ditello; he discussed the property across from his business and the defendant said there was too much opposition as far as the neighborhood people were concerned and he would not go along with that piece of property being sold to Ditello or to the trucking industry. Prior to Christmas of 1971, Mr. Ditello met with Mr. Nowakowski at Como's restaurant and they discussed a committee hearing where the interest of Roman Electric Company in acquiring part of the property known as the car barns nearby had been talked about. The defendant said he was favorable to a plan whereby Ditello's company would share the property in question with Roman Electric. He testified that Mr. Nowakowski said, ". . . now that we have finished with that discussion, there is something you can do for me, if possible. I have a campaign coming up and I have a large mailing, and I need some stamps. . . . I could use 10,000 eight-cent stamps." Mr. Ditello said he would think about it. About the middle of January, the defendant called, asking whether or not Mr. Ditello would do anything about the stamps. He answered he had not given it much thought but that he would give him the stamps. After he got the stamps he called the defendant and asked him how he wanted to handle it and the defendant said to bring them to the defendant's house and he gave Mr. Ditello his address. He told his son to deliver them but no one was home. He then called the defendant and told him there was no one home. The defendant

said he would be there shortly. Mr. Ditello personally delivered the stamps; there was no one at home, but he left the stamps at the front door and then later called the defendant and told him that he had delivered the stamps and was told by the defendant that he had received them. Mr. Ditello also testified that the defendant was free to use those stamps in his campaign. Mr. Ditello did move his operation to a site nearby but testified that he left the property after a year and a half because of opposition from the people in the area.

The state also introduced into evidence the minutes of the county highway committee for September 2, 1971, October 26, 1971, November 18, 1971, and January 6, 1972. The minutes for January 6, 1972, regarding the purchase or rental of the north shore car barn property located at Fifth and Harrison Street showed that the attorney for National Transit Cartage Company appeared and urged the committee to authorize the sale of the land and stated that the interested parties would negotiate among themselves, which included the Roman Electric Company. The minutes show that "Supervisor Nowakowski recommended that the land be sold, stating that it would be put back on the tax rolls."

The state introduced the preliminary statement filed pursuant to sec. 12.09 (5) (a), Stats. 1971, of "Supervisor Nowakowski Victory Comm.," showing the date of organization as March 5, 1972. The stamp on the document shows it was filed with the Milwaukee county election commission on March 8, 1972. This is the so-called "voluntary committee" made up of others supporting the candidate. Its filings are separate and apart from a filing by a candidate or by a personal campaign committee of a candidate under the statute. In this case, the defendant did not have a personal campaign committee. The state also introduced the financial statements of the victory committee for March 24, March

28 and April 16, 1972, none of which showed a receipt of $800 in stamps from Mr. Ditello. The state also introduced the personal campaign statements of the defendant for the preprimary, postprimary, pre-election and postelection filings required under the law, none of which showed a receipt by the defendant of the $800 in stamps. The postelection filing was the one in question, dated April 20, 1972.

The defendant testified in his own behalf, stating he had been a supervisor for ten and a half years and was the chairman of the Milwaukee county board. He stated that he had asked Lynn Nowakowski, who was not a relative, to serve as the treasurer of a voluntary committee in his behalf during the late part of 1971. He stated that throughout he was campaigning heavily and that in December, January, February and March, people from the voluntary committee were meeting in his home. He said that early in January there was a discussion at his house with members of the voluntary committee about a first-class mailing in his district and that he told them he had a contributor who would probably contribute enough stamps for a mailing by the committee. He testified the man he had in mind was Mr. Ditello. He said he first met Mr. Ditello at a board meeting in the late summer of 1971 and had told him at the time that he was opposed to Ditello's getting a lease to add to his property because he was next door to Darling Freight; that it was because of noise and traffic conditions that he could not agree to having a second truck firm right where there were residences, and he stated he never changed his mind on that issue. He said in the fall of 1971 he was again approached by Mr. Ditello about adding to the property and told him that the answer was "No." He said he advised Mr. Ditello that Roman Electric was interested in purchasing the old north shore car barns, but that there was too much property for

their needs and he suggested he join with Roman Electric to try and purchase or lease that acreage which would put him two and a half blocks away from the truck terminal. He said the conversation took place at the October 26th board meeting and he said he was on record favoring Mr. Ditello's lease of the car barn property with Roman Electric. He said he next saw Mr. Ditello in November of 1971, at Baker's restaurant and then again in December at Como's. He stated he asked Mr. Ditello for the stamps right before Christmas and that up to that time there had never been any discussion about a contribution. He stated he actually had no objection to either Darling Freight or Ditello working out an arrangement with Roman Electric. He said that the north shore car barns are approximately two and a half blocks to the south of Fifth and Harrison and the truck terminal site of National Transit. He said that on October 26th he publicly went on record as supporting a resolution for leasing the car barn property to Roman Electric and the other truck line and afterwards he had told Ditello that it would be fine if he could work it out with Roman Electric. The committee meeting minutes of January 6th show a request for sale of the north shore car barn at which Mr. Ditello appeared by attorney and stated they were discussing the matter with Roman Electric. The defendant stated that this is the land he had discussed with Mr. Ditello in October of 1971, and that that was a different piece of land than the one he had objected to. He said his contact about getting the stamps was in mid-January of 1972 and that after they were received he acknowledged receipt and that he thanked Mr. Ditello. He said the stamps were intended for district-wide mailing by his voluntary committee. He said that somewhere between March 7th and 10th there was a decision to abandon the first-class mailing because he said it was obvious they did not

need it in order to win. During the campaign he solicited other contributions from businessmen with the thought that they would be for the voluntary committee. He sometimes got cash which he gave to Lynn Nowakowski. He said that he did not think about the stamps and that between March 1st and April 18th the stamps did not come to his attention. He was spending very little time at the house and the next time he had heard about the stamps was when he read about them in the paper around the end of August of 1972. He said he asked Lynn Nowakowski what happened to the stamps; he went home and searched his office and they were in the credenza behind his desk. He stated he had reported these stamps to his committee, that he never did wilfully, deliberately or intentionally fail to report the receipt of the stamps. He said that all funds he received he turned over to the committee. When he talked to Lynn Nowakowski in August after the newspaper story, she said she had forgotten to report the stamps in the voluntary committee reports. He stated that he anticipated and expected that his voluntary committee would be reporting the stamp contribution.

Lynn Nowakowski (Mrs. LaMalfa, at the time of trial) testified that Mr. Nowakowski had asked her to be treasurer of the campaign committee toward the end of 1971; she attended various meetings in his home in January, February and March, and that other people were also present. She stated there was discussion in early 1972 of a first-class mailing and that the defendant told her he had received a contribution of stamps for whenever the committee might have a first-class mailing. She stated on direct examination, she did not report the stamps because she had forgotten. She said she did not remember whether the defendant ever told her or whether she had ever asked him for the name of the contributor and that she did not think of it until

the newspaper stories came out. On cross-examination, she stated that Mr. Nowakowski must have forgotten to ask her to report the $800 in stamps. She also testified that the defendant looked over the financial statements she filed for the committee.

Cheryl Fosburgh testified that she was a friend of the defendant and worked in the campaign. She said that in the early part of the campaign when other committee members were there, there was a discussion of a first-class mailing, but she could not remember if there was any discussion of about how the mailing would be paid for. She testified that on the afternoon the stamps were delivered that children were working on a mailing project and the doorbell rang. She went to the door and a man asked her if Mr. Nowakowski was at home; she said he was not; she said the man gave her a small, brown bag and asked if she would see that he got it; she said "Yes" and he left. She did not know him. He was wearing a brownish trench coat and a hat. She saw the man after that and it was Mr. Ditello. She stated there were rolls of stamps inside of the brown paper bag. She did not count them and did not remember what denomination they were. She put the bag on the corner of the desk in Mr. Nowakowski's office. She told the defendant that the postage had been delivered and did not remember what he said. She said the postage was sitting there during the other campaign projects and was not removed during the entire campaign. She said that Mr. Ditello had delivered the stamps at the back door and that he stood on the steps and that she remembered that it was raining and there was no snow on the ground.

Defendant's counsel alleges 11 errors as grounds for reversal of the judgment of conviction. We first will consider those errors alleged to derive from the trial of the defendant.

Defendant's first challenge goes to the sufficiency of the evidence. When the state rested, defendant moved for judgment of acquittal, which motion was denied. Again, at the close of all the testimony, defendant moved for a directed verdict of acquittal, which was also denied. Finally, defendant moved after verdict for a judgment of acquittal notwithstanding the verdict and for a new trial, one ground for which was the sufficiency of the evidence. Both motions were denied. This court has held that where a defendant moves for a dismissal or a directed verdict at the close of the prosecution's case and when such motion is denied, " '. . . the introduction of evidence by the defendant, if the entire evidence is sufficient to sustain a conviction, waives the motion to direct.' " *Strait v. State* (1969), 41 Wis. 2d 552, 558, 164 N. W. 2d 505. The only question here is, was all the evidence sufficient to sustain the jury's verdict of guilty?

This court on many occasions has stated the proper standard to be applied by this court in reviewing the record on the question of sufficiency of evidence in a criminal case tried to a jury.

The only question for this court is whether the evidence adduced, believed, and rationally considered by the jury was sufficient to prove the defendant's guilt beyond a reasonable doubt. The test is not whether this court is convinced of the guilt of the defendant beyond a reasonable doubt but whether this court can conclude the trier of facts could, acting reasonably, be convinced to the required degree of certitude by the evidence which it had a right to believe and accept as true. In other words the evidence when considered most favorably to the state and the conviction must be so insufficient in probative value and force that it can be said as a matter of law that no trier of the facts acting reasonably could be convinced to that degree of certitude

which the law defines as "beyond a reasonable doubt." *Zebrowski v. State* (1971), 50 Wis. 2d 715, 723, 185 N. W. 2d 545. The burden on the state here was to prove that the defendant intentionally and deliberately failed to report a campaign contribution of over $5 which was given to him for his use for political purposes while he was a candidate for public office. There is no dispute that he was a candidate for the Milwaukee county board of supervisors in the 1972 spring election. There is no question that he personally solicited $800 in postage stamps from Angelo Ditello in December of 1971 and that he stated that these stamps were to be used for political purposes and there is no question that the stamps were given for political purposes. There is also no question the defendant did not list this contribution in any of his financial statements which he was required by law to file, and there also is no question that the Nowakowski victory committee did not list the contribution.

The first question is, was there evidence on which the jury could find beyond a reasonable doubt that the contribution was one to the defendant and not to the committee, and secondly, was there evidence on which the jury could find beyond a reasonable doubt that the defendant intentionally, deliberately and wilfully failed to report receipt of the contribution in his campaign-financing statements?

When the defendant asked Mr. Ditello for the stamps he spoke in terms of the first person and not in terms of a committee. After the request for the stamps was made, a month passed and then the defendant called Mr. Ditello and asked for the stamps again. When Mr. Ditello asked how he wanted the matter handled, he said, "bring them to my house." When Mr. Ditello brought the stamps, there was no one home, so he left the stamps at the front door; later he called the defendant at his office and the

defendant said that he had received the stamps. This occurred sometime in the second week of January.

Cheryl Fosburgh testified that Mr. Ditello had delivered the stamps to her and that the day he did so it was raining. This contradicted the testimony of Mr. Ditello. The state introduced weather records showing that it was quite cold, averaging minus 18 degrees, and that it did not rain on the day in question. The treasurer testified she opened a checking account for the committee in early January. However, the state introduced evidence that the bank account was not opened until March of 1972. The jury also had a right to consider the fact that the victory committee, which by law was not to solicit or to receive contributions until after it had filed its preliminary statement did not file such a statement until March 8, 1972—some fifty days after receipt of the contribution and almost three months after the solicitation of the contribution. The statement filed was notarized by the defendant. Senator Ronald Parys, state senator, testified on behalf of the defendant that he followed the practice, which he said was customary in Milwaukee county, that candidates solicited contributions and turned them over to the "voluntary" committees. On cross-examination he testified that he never solicited or received contributions until the voluntary committee was formed and that if a contribution was given before the committee was set up, "I would probably turn it down until a committee was formed."

Looking at the evidence in the light most favorable to the state, as we must on appeal, we cannot say that as a matter of law the evidence is so insufficient in probative value and force that no jury acting reasonably could be convinced beyond a reasonable doubt that the contribution of the stamps was made to the defendant. *See: Zebrowski v. State, supra.*

The next question involves the intent of the defendant not to include the donation in his financial reports. The stamps were received prior to the filing of the first of the four reports filed by the defendant. The stamps were not listed on any of them.

The defendant denied any intent to conceal the contribution. In short, the evidence showed that the defendant had publicly opposed Mr. Ditello's expanding his trucking operation at or near his original site and then later the defendant publicly supported Mr. Ditello's acquisition of another site a short distance away. There was testimony as to neighborhood opposition to the expansion of the trucking industry. The evidence showed that the defendant asked for and received a contribution of $800's worth of stamps from Mr. Ditello.

The jury obviously disbelieved the defendant's disavowal of an intent not to publicly reveal the stamp donation. We have repeatedly held that the credibility of witnesses is for the jury. The jury had to determine the defendant's intent from the circumstances surrounding the donation. In *State v. Schenk* (1972), 53 Wis. 2d 327, 332, 193 N. W. 2d 26, this court said:

"Since the law cannot enter the subjective mind of an individual accused, intent must be evidenced by inferences from the words and conduct of the actor and the circumstances surrounding the act."

The state's case rests on circumstantial evidence. However, ". . . circumstantial evidence can be as forceful as eyewitness testimony and can form a rational basis for conviction." *Zebrowski v. State, supra,* at 722. In assessing the sufficiency of evidence on appeal, this court has said, "Reasonable inferences drawn from the evidence can support a finding of fact and, if more than one reasonable inference can be drawn from the evidence, the inference which supports the finding is the one that must be adopted." *Bautista v. State* (1971),

53 Wis. 2d 218, 223, 191 N. W. 2d 725. We conclude that the evidence viewed in the light most favorable to the state was sufficient for the jury to find beyond a reasonable doubt that the defendant intentionally withheld reporting the contribution of $800's worth of postage stamps from Mr. Ditello.

The next question involves the alleged error of the trial court in admitting the documentary exhibits; the first one is the preliminary statement of the victory committee. The record shows that the defendant explicitly stipulated on the record that he had no objection to this document and it was accordingly received in evidence; however, the next day he tried to withdraw his stipulation and assert a relevancy objection. The trial court, however, admitted the document. However, the issue of whether the defendant should have been permitted to withdraw his stipulation was not raised in his motion for a new trial and does not give the defendant a right to raise the issue on appeal. *Wells v. Dairyland Mut. Ins. Co.* (1957), 274 Wis. 505, 80 N. W. 2d 380. However, we would rule that the evidence was not irrelevant. Sec. 904.01, Stats., states:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

One of the main points in the state's case was that the contribution was not to the voluntary campaign committee but to the defendant personally. The document in question which showed that the committee was not organized until approximately fifty days after receipt of the contribution made this document relevant. Defendant also objected that the document constituted "hearsay." This document is clearly an exception to the hearsay rule; it was a public document, filed under oath, was actually notarized

by the defendant, and is one having "circumstantial guarantees of trustworthiness" under sec. 908.03 (24), Stats.[5]

The defense also objected to the admission of the minutes of the highway committee for September 2, October 26, November 18, of 1971, and January 6, 1972. These were the official minutes of the highway committee and their authenticity was stipulated to by the counsel for the defendant. They were admissible under sec. 908.03 (6) of the statutes as "Records of regularly conducted activity."[6] The minutes were relevant; they showed the position the defendant had taken with respect to Mr. Ditello's interest in property for trucking and in effect bear out what Mr. Nowakowski testified to at the trial, *i.e.*, that he opposed Mr. Ditello's acquisition of certain property and supported his acquisition of other property.

The other documents objected to were the financial reports of the victory committee. The committee apparently did not file a preprimary report but did file reports on March 24 (which showed receipts before the primary), March 28, and April 16, 1972. Here again these were public documents that were sworn to and relevant for the purpose of showing that the stamp contribution had not been listed as a contribution by the victory committee. We hold that the receipt of these various documents in evidence was proper.

[5] "908.03 **Hearsay exceptions; availability of declarant immaterial.** The following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . .

"(24) OTHER EXCEPTIONS. A statement not specifically covered by any of the foregoing exceptions but having comparable circumstantial guarantees of trustworthiness."

[6] "A . . . record . . . of acts . . . made at . . . the time by, . . . a person with knowledge, all in the course of a regularly conducted activity . . . ."

The next issue raised by the defendant is the claimed error by the court in refusing to grant a mistrial for alleged prosecutorial misconduct. The alleged misconduct arises out of questions asked by the prosecutor of Miss Fosburgh, relative to her relationship with the defendant, and whether she was living with anyone at the present time; and as to the defendant, whether or not he had ever received a contribution of salt from Mr. Ditello in addition to the stamps. Objections to this line of questioning were sustained. We conclude from reading the record that the conduct complained of considered in the context of the entire trial was not so prejudicial as to constitute grounds for a mistrial.

The defendant alleges it was reversible error for the court not to instruct on the meaning of the word "substantial" in connection with the definition of what constitutes a violation of the act. The defendant had requested that the following instruction be given:

"The term 'substantial' is in this case, a word of art. . . . In order to find that the violation charged was substantial, you must be satisfied beyond a reasonable doubt that the defendant's failure to include the alleged contributions in his financial statement so affected or tended to affect the minds of the electors that the . . . will of the electors cannot be ascertained."

In his principal brief the defendant cites the case of *State ex rel. Pelishek v. Washburn* (1937), 223 Wis. 595, 270 N. W. 541.

In *State ex rel. Hampel v. Mitten* (1938), 227 Wis. 598, 278 N. W. 431, this court in referring to violation of ch. 12 of the statutes stated that with respect to *Pelishek,* page 605:

". . . it was intended to hold that a deliberate, wilful, intentional, and substantial violation of the act which upon its face has a natural tendency to influence voters

makes it impossible to ascertain the true will of the electors and carries with it the penalty of ouster."

The defendant also argues that the will of the electors could not be affected by his failure to file a report on April 20, 1972, since the election was on April 4th. The defendant states in his reply brief:

"When the defendant filed his report on the 20th of April, it could not have affected either of the prior elections. Despite the prosecutor's argument, to find otherwise would be a logical absurdity."

To hold that the requirements of reporting under the act apply only to reports filed prior to an election would be to render the act meaningless, which is certainly not the legislative intent. We hold that as a matter of law the wilful and deliberate failure to report an $800 contribution either before or after an election constitutes a substantial violation of the act.

We next consider the errors alleged to derive from the grand jury proceedings including the sufficiency of the indictment on which the defendant was convicted. On August 23, 1972, the Milwaukee county district attorney applied for the appointment of a special prosecutor to investigate ". . . alleged unlawful conduct on the part of the chairman of the Milwaukee county board of supervisors and such other matters as may be developed through such investigations . . . ." The Milwaukee county judges disqualified themselves and the chief justice of this court appointed ANDREW W. PARNELL, Reserve Circuit Judge, for purposes of proceeding on the petition. Judge PARNELL appointed a special prosecutor and on the special prosecutor's petition the circuit court summoned a grand jury on October 12, 1972. The term of the grand jury was extended into the January term of the circuit court on December 26, 1972.

The state in its brief says that 11 individuals and corporations were indicted by the grand jury including

this defendant. On March 28, 1973, the defendant was indicted in three separate indictments on bribery, five counts of solicitation of perjury and two counts of campaign reporting violations. On the same day that the grand jury was terminated, the special prosecutor and his assistant resigned and Judge PARNELL appointed Robert W. Warren, the attorney general for the state of Wisconsin, and his designees, as special prosecutor. The chief justice of this court assigned ROBERT J. PARINS, Circuit Judge of the Fourteenth Judicial Circuit, to act as trial judge for the trial of the defendant. The defendant was acquitted of the bribery count; all other counts except one count of campaign reporting violation were dismissed.

In May of 1973, the defendant moved to dismiss the indictment in this case and the then existing other indictments on the ground of prosecutorial misconduct in pressuring and influencing the grand jury. He also moved for an evidentiary hearing to present evidence in support of that motion. The trial court granted the requested evidentiary hearing on the issue of prosecutorial misconduct and such hearing was held on July 23, 1973. The record shows the trial court also studied portions of the grand jury transcript. After nine witnesses, including the prosecutors, were called and examined by the defendant, the trial court denied the defendant's motion to dismiss the indictments. The trial judge found no evidence of the prosecutors advising the grand jury that it had to return specific indictments, or that there was any pressure or cajoling of the grand jury into returning indictments, or proof of improper conduct of investigators in the presence of the grand jury, or of any deliberate withholding from the grand jury of any exculpatory evidence. That order denying defendant's motion is not challenged in this appeal; however, on August 7, 1973, defendant again moved to dismiss the indictments ". . . because of the totality of conduct by the prosecution,

and the method in which the grand jury was conducted, amounted to a denial of due process to the defendant." The motion did not ask for an evidentiary hearing but that was asked for in an affidavit by the defendant's counsel dated September 17, 1973, alleging that since the hearing of July 23, 1973, instances of prosecutorial misconduct had come to his attention and in support thereof he filed 15 affidavits from individuals alleging various kinds and degrees of supposed misconduct by the prosecutors and their investigative agents. In a written decision the trial court analyzed each of those affidavits and held that none of the alleged misconduct, if true, could have had a prejudicial impact on the grand jury.

This court has examined these affidavits, including an affidavit by the defendant's counsel, the latter with respect to derogatory information presented to the grand jury on which it is contended there was no intent to bring prosecution, and including a charge that the prosecutorial staff stimulated adverse newspaper publicity against the defendant.

We are satisfied these affidavits do not allege misconduct of sufficient magnitude and sufficiently closely related to the grand jury proceedings to make out even a prima facie case of prejudicial prosecutorial misconduct. There is no allegation that anyone testified falsely before the grand jury as the result of any actions on the part of the prosecutors or their investigators outside of the presence of the grand jury. While the defendant's attorney's affidavit alleges that the prosecutorial staff stimulated adverse publicity, there is no allegation that the publicity was of sufficient quantity and adversity that it prejudiced the grand jury.

Defendant alleges that he was denied a fair and impartial grand jury because the grand jury was convened to selectively investigate the defendant. Defendant cites

no controlling authority nor do we know of any that holds that a grand jury may not be called to investigate allegations of criminality of one individual or to pursue such a course when convened.

The second charge of defense counsel is more serious. Defense counsel, in his brief, states, "Despite attempts by defense counsel to bring to the Court's attention identical violations, no other officeholders were similarly charged." This involves the question of selective prosecution; that there were others similarly situated, known to the prosecution, and that only the defendant was singled out for prosecution. The defendant presented no proof by affidavit or otherwise that others similarly situated were failing to report large political contributions and that their violations of the statutes were known to the prosecutors and that the prosecutors ignored them and prosecuted the defendant. In raising this issue the defendant calls to our attention *United States v. Falk* (7th Cir. 1973), 479 Fed. 2d 616, 620–623. There the standard for determining whether an evidentiary hearing is required was said to be the showing by the defendant of at least a prima facie case of improper discrimination in enforcing the law. And this was further defined to require the allegation of "intentional purposeful discrimination" and the presentation of "facts sufficient to raise a reasonable doubt about the prosecutor's purpose." In the *Falk Case*, Falk was a vocal and active draft resister and counselor. He was indicted on one count of failure to submit to induction and three counts of failure to carry proper selective service credentials. A jury found him guilty of all four charges. The district court granted a posttrial motion for dismissal of the first count, finding no basis for denying Falk conscientious objector status, but imposed sentences on the card-carrying charges. On appeal the seventh circuit panel upheld the conviction; however, on a rehearing

en banc the full court remanded the case to a different district judge for an evidentiary hearing on Falk's claim that the prosecution was unconstitutionally selective. Falk had made a pretrial motion to dismiss and a motion for acquittal at the close of the government's case on that ground and supported those motions with evidence. There was an allegation of massive nonenforcement of the statute and there was a presentation of a policy statement by the director of the selective service system stating that, by agreement with the department of justice, violators of the card-possession regulations would not be prosecuted but would be "processed administratively." There was also testimony at the trial that the decision to prosecute Falk was made by a "distinguished succession of officials" from the department of justice in Washington down to the United States attorney. Falk also offered to prove that the United States attorney who tried the case had told Falk's attorney that Falk's draft-counseling activities was one of the reasons the prosecution was brought. Comparing the showing in *Falk* to the general allegations of unconstitutional selectivity and prosecution alleged here, the conclusion is inescapable that the defendant has failed to present even a prima facie showing of a discriminatory prosecution. In his reply brief the defendant in reference to this issue questions, "Was this prosecution in some way based upon an impermissible premise such as race or politics?" Race, religion or other arbitrary classification would be grounds for supporting a finding of a denial of the equal protection clause of the constitution. *Oyler v. Boles* (1962), 368 U. S. 448, 456, 82 Sup. Ct. 501, 7 L. Ed. 2d 446. However, the mere raising of the question without supporting evidence is not sufficient to require an evidentiary hearing on the point or for a dismissal of the charge on appeal.

The defendant alleges in his brief, "The indictment failed to include one of the elements of the crime, to wit:

intent, and therefore was jurisdictionally defective and void." Defendant cites the case of *State v. Schneider* (1973), 60 Wis. 2d 563, 567, 211 N. W. 2d 630. That case held that an allegation that an act was performed "feloniously" does not thereby allege intent and is insufficient where scienter is required. The case involved the possession, for sale, of obscene material.

Two recent cases have construed the meaning of *Schneider;* the first is *Clark v. State* (1974), 62 Wis. 2d 194, 203, 214 N. W. 2d 450. The court held that *"Schneider* . . . [goes] directly and only to the question of whether scienter is a constitutionally required element in a criminal obscenity statute because it is intimately related to the constitutional scope (first amendment) of the power to bar material as obscene." The information in *Clark* alleged that the defendant was feloniously involved in the commission of the murder of Troy Pulliam, a human being, contrary to the form of the statute, sec. 940.01 (first-degree murder) and sec. 939.05 (party to a crime). The argument was made that no crime was alleged because the state did not use the precise language of the statute in the information. This court said:

"While we are satisfied the rights of the defendant have not been prejudiced in any way, and he does not assert they have been, nonetheless, he seeks reversal of his conviction because of a technical defect in the information discovered by counsel appointed to review his conviction.
"Sec. 971.26, Stats., provides as follows:
"971.26 **Formal defects.** No indictment, information, complaint or warrant shall be invalid, nor shall the trial, judgment or other proceedings be affected by reason of any defect or imperfection in matters of form which do not prejudice the defendant.
"' . . .
"Also, the information stated that murder had been committed 'contrary to the form of . . . section 940.01 . . . .' In *State v. Bachmeyer* (1945), 247 Wis. 294,

301, 19 N. W. 2d 261, an information charged that the defendant:

"... 'Peter Bachmeyer . . . on the 20th day of March, A. D. 1938, at the city of Eau Claire in said county of Eau Claire and state of Wisconsin, did aid, in the commission of an offense which was a felony, to wit, murder in the first degree, as defined by section 340.02 of the Wisconsin Statutes, contrary to section 353.05 of the Wisconsin Statutes, and against the peace and dignity of the state of Wisconsin.'

"The court affirmed the conviction and concluded that:

" '. . . Sec. 355.23, Stats., provides that no indictment or information shall be deemed invalid by reason of any defect or imperfection in the matters of form which shall not tend to the prejudice of the defendant. Defendant was charged with having aided in the commission of the offense of murder in the first degree, as defined in sec. 340.02. This necessarily carried with it all of the elements of the offense charged under said section, and the information also set forth the section under which the defendant was being prosecuted. It is considered that the defendant was not prejudiced by the information under which he was prosecuted.' *State v. Bachmeyer, supra,* page 302." *Clark* at pages 200–202.

To the same effect as the holding of *Schneider, see Organ v. State* (1974), 65 Wis. 2d 36, 43, 44, 221 N. W. 2d 823.

In *Organ* a complaint and an information filed did not allege intent in a charge of receiving stolen property. This court noted at pages 40, 43, 44:

"The defendant moved for dismissal on the grounds that the information does not state intent, state the words of the statute or show ownership or description of the property. The motion was denied. The state's motion to insert the word 'intentionally' between 'feloniously' and 'receive' was granted. . . .

"Sec. 971.31 (8), Stats., provides:

" 'No complaint, indictment, information, process, return or other proceeding shall be dismissed or reversed for any error or mistake where the case and the identity

of the defendant may be readily understood by the court; and the court may order an amendment curing such defects.'

"The complaint in this case, as far as the charging portion goes, is adequate. The defendant knew the crime he was charged with and could prepare a defense to it. He was not prejudiced by it. The case and the identity of the defendant were obvious to the court. The amendment of the information was proper pursuant to sec. 971.31 (8), Stats."

In this case the violation in the indictment was stated with reference to the section numbers of the statutes which were alleged to be violated. The trial court in the case at bar advised the parties prior to trial that the state would have to prove intent and an instruction on intent was given to the jury. Thus the defendant was apprised of the statutory violation with which he was charged and the elements that the state would need to prove in order to get a conviction.

As this court stated in *Organ,* page 43:

"Here the defendant knew precisely what offense he was charged with having committed. No claim is asserted that he did not know the nature and cause of the charges made against him, or that he was in any way prejudiced by the failure of the state to use the exact language of the statute in the complaint."

The statute in this case does not contain the word "intent" or "intentionally." This court is divided as to whether or not intent is an element of the crime charged. The majority holds that intent is required in order to sustain a conviction. A minority of the court would hold that the failure to report the receipt of a campaign contribution is *malum prohibitum* and no intent not to report need be proved. Here, the statute alleged to be violated was cited by number in the indictment. The requirement of proof of intent to violate it was stated by the court to be required prior to trial and the jury

was properly instructed on intent. The court is unanimous in holding that the indictment was sufficient.

The defendant claims that sec. 12.70, Stats. 1971, is unconstitutionally vague and indefinite, alleging the penalty provision does not make it clear if it charges a felony or a misdemeanor. Prior to trial the defendant moved to quash the indictment on the ground that the penalty provision of the statute under which he was prosecuted was unconstitutionally vague and indefinite and was an impermissible delegation of legislative power to the judiciary or to the executive branch of government. The denial of that motion was asserted as one of the grounds in the defendant's motion for a new trial and the issue is raised before us on appeal. The defendant cites no authority in support of his position on this issue. He also claims he is unable to determine the severity of the charge which he must defend and therefore the statute does not give fair notice. We disagree. The power to determine whether the offense is a felony or misdemeanor was not delegated; it was determined by the legislature. The offense clearly states that it is punishable by imprisonment in the state prison. This is clearly a felony under sec. 939.60.[7]

This court in *Pruitt v. State* (1962), 16 Wis. 2d 169, 172, 114 N. W. 2d 148, said:

"A felony carries the potential of imprisonment in prison. However, one convicted of a felony who is sentenced to less than one year may be confined in the county jail without changing the nature of the crime to that of a misdemeanor."

Paul P. Lipton in an article *The Classification of Crimes in Wisconsin*, 50 Marq. L. Rev. (1966), 346, 347, said, ". . . *Pruitt v. State* indicate that the *maximum*

---

[7] "939.60 **Felony and misdemeanor defined.** A crime punishable by imprisonment in the state prison is a felony. Every other crime is a misdemeanor."

statutory punishment will determine the grade of the offense. A crime that *may* be punished by imprisonment in the state prison normally will constitute a felony, even though the court is authorized to, and does in fact, impose a lesser sentence. The same rule apparently prevails in almost every jurisdiction having a similar statutory definition."

Several state courts have held that a statute which provides for penalties disjunctively—state prison *or* county jail—is not constitutionally defective; the power to determine the severity of the sentence (within statutory limits) and the particular place of confinement may be delegated. *State v. Blanchey* (1969), 75 Wash. 2d 927, 454 Pac. 2d 841; *Bernard v. State* (1967), 248 Ind. 688, 230 N. E. 2d 536. *See: Harms v. State* (1967), 36 Wis. 2d 282, 153 N. W. 2d 78.

We therefore hold that this statute as applied to the defendant herein is constitutional.

The defendant alleges that the trial court committed error in not granting his motion for a new trial in the interest of justice. In ruling on that motion the trial court said:

"The final basis for a new trial is in the interests of justice. Gentlemen, I am satisfied that the real controversy in this case has been fully, fairly and competently tried. . . .

"I am satisfied that Mr. Nowakowski has had the benefit of a fair trial in every respect. In order for the court to grant a new trial in the interests of justice, the law requires that the trial judge must find either that justice has probably miscarried—I am not satisfied that that happened in this case, I cannot make a finding that justice probably miscarried, or I must find that probably a new trial would result in a contrary finding.

"I am not persuaded that under the totality of the evidence in this case, given to another jury, the same evidence might not produce the same result. Knowing of no particular item that would require the court to

grant a new trial in the interests of justice, I therefore of course cannot grant a new trial based on that issue. "The verdict of the jury is affirmed. . . ."

This court said in *Strait v. State* (1969), 41 Wis. 2d 552, 564, 164 N. W. 2d 505:

"A new trial in the interest of justice is granted by this court, in our discretion, only in those instances where it clearly appears from the record that there has been a probable miscarriage of justice. The mere possibility of a contrary result in a new trial is not sufficient; there must be a showing of probable miscarriage of justice and probability of acquittal."

We agree with the conclusion of the trial court. We are satisfied that the other allegations of error raised by defendant are without merit.

*By the Court.*—Judgment affirmed.